**Frank PIRKHEIM and Roxanne Pirkheim, as parents of Logan Pirkheim, deceased, Plaintiffs,**

v.

**FIRST UNUM LIFE INSURANCE COMPANY, a foreign corporation, Defendant.**

No. Civ.A. 97–B–2528.

United States District Court, D. Colorado.

May 28, 1999.

Scott J. Eldredge, H. Michael Steinberg, Hersh & Houliston, P.C., Englewood, CO, for plaintiff.

Sandra L. Spencer, White and Steele, P.C., Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendant, First UNUM Life Insurance Company ("First UNUM"), moves for summary judgment pursuant to Rule 56. Plaintiffs, Frank Pirkheim and Roxanne Pirkheim, also move for summary judgment pursuant to Rule 56. The cross-motions, which require construction of an insurance policy, are adequately briefed and oral argument will not materially aid their resolution. For the reasons set forth below, I grant First UNUM's motion and deny Mr. and Mrs. Pirkheim's motion. Subject-matter jurisdiction exists under 28 U.S.C. § 1331.

## I. FACTS

The following material facts are undisputed unless otherwise noted. Mr. and Mrs. Pirkheim are the natural parents of Logan Pirkheim, who was born on May 31, 1990 with Downs Syndrome and congenital heart disease. On January 29, 1991, Logan underwent surgery in Albany, New York. Surgeons repaired the atrial and ventricular septal defects of his heart. Although the surgery was successful, some of the nerves regulating Logan's heartbeat were damaged, causing him to suffer from an abnormal heart beat, also known as arrhythmia. To mask the abnormality and properly regulate Logan's heart beat, doctors implanted a pacemaker on February 5, 1991. The pacemaker functioned properly after its implantation.

On October 8, 1995, Roxanne Pirkheim discovered Logan in distress and suffering from arrhythmic seizures. He was rushed to the hospital, but died later that day after doctors attempted to save his life.

The original Certificate of Death, prepared by Michael Schaffer, M.D., does not identify any cause of death and indicates that an autopsy is "pending." (10/8/95 Cert. of Death, Ex. A of Def.'s Brf. at 47.) Sherrie Caldwell, M.D., a pathologist, conducted an autopsy and concluded as follows:

> Logan was a 5–year–old boy with Down syndrome and congenital heart disease. His atrial and ventricular septal defects were repaired at 8 months of age. Post operatively he had a complete heart block requiring a permanent pacemaker. He did well following his initial surgery.
>
> \* \* \* \* \* \*
>
> At autopsy, the previous cardiac repair was found to be intact. Microscopically, there were scattered remote microscopic infarcts, and a few mineralized subendocardial myocytes were noted. The only other findings of significance were related to terminal hypoxia/ischemia. These included cerebral congestion and edema, pulmonary congestion and edema, and a peritoneal effusion. The pacemaker was removed for further investigation.
>
> In summary, the cause of death was apparent pacemaker failure in this 5–year–old boy who was pacemaker dependent following repair of his congenital heart disease.

(Comment of Dr. Caldwell, Ex. A of Def.'s Brf. at 42.) The pacemaker was subsequently examined by Intermedics Inc.'s Reliability Analysis Laboratory, compelling it to conclude:

> The tests show that the pacemaker was performing within all mechanical and electrical specifications for a unit at this stage. The battery depletion analysis showed that the battery was depleted. The tests show that the "Elective Replacement Indicator" as well as the "Intensified Follow-up Indicator" were triggered prior to the device going to "no-output."

(Ltr. from Devine to Mr. and Mrs. Pirkheim of 11/9/95, Ex. A of Def.'s Brf. at 62.)

Dr. Schaffer then prepared an Amended Certificate of Death that attributes Logan Pirkheim's death to "Cardiac Arrhythmia," "Pacemaker Malfunction," and "Congenital Heart Disease." (12/8/95 Amended Cert. of Death, Ex. A of Def.'s Brf. at 70.) On a date not disclosed by the record, Mr. and Mrs. Pirkheim commenced a civil action against Dr. Schaffer in the District Court for the City and County of Denver, alleging, *inter alia,* that he failed to properly diagnose and care for Logan Pirkheim. On a date not disclosed by the record, Mr. and Mrs. Pirkheim settled their claims against Dr. Schaffer.

At the time of his death, Logan was an "Insured" under an accident insurance policy purchased by Mr. Pirkheim. The policy states, in relevant part:

### INSURING CLAUSE

We agree with the Policyholder to cover each Insured for any loss described in Part I in return for the payment of premiums and subject to the provisions which follow. The loss must result directly and independently of all other causes from accidental bodily injury which occurs while this policy is in force as to the Insured, herein called "injury."

\* \* \* \* \* \*

### Part I—DESCRIPTION OF COVERAGE

If an Insured suffers any one of the losses shown below as a result of "injury", We will pay the sum shown for the loss.

\* \* \* \* \* \*

For Loss of Life ............ The Principal Sum

\* \* \* \* \* \*

### Part II—EXCLUSIONS

We will not pay if the loss is caused by ... illness, disease, bodily infirmity, or any bacterial infection....

(First UNUM Life Insurance Company Accident Insurance Policy ("the policy"), Ex. B of Def.'s Brf. at 1, 4 (emphasis in original).) The parties agree that the "Principal Sum" at issue is $100,000.

On December 13, 1995, Mr. Pirkheim filed a claim for accidental death benefits pursuant to the policy. On January 4, First UNUM issued a letter denying his claim for benefits. That letter states, in relevant part:

> Since it appears that death was not an accidental bodily injury direct and independent of all other causes, and there was the underlying bodily infirmity necessitating the use of the pacemaker, we have no alternative but to disallow this claim....

(Ltr. from Tetto to Mr. Pirkheim of 1/4/96, Ex. A of Def.'s Brf. at 53–54.) Mr. Pirkheim then appealed the denial to the First UNUM Appeal Committee, which affirmed the denial for the reasons stated in the initial denial letter. (Ltr. from Tetto to Lindberg of 2/14/97, Ex. A of Def.'s Brf. at 32.) The First UNUM Appeal Committee then reaffirmed the denial on May 16, 1997. (Ltr. from Tetto to Eldredge of 5/16/97, Ex. A of Def.'s Brf. at 26.)

## II. PROCEDURAL HISTORY

On October 7, 1997, Mr. and Mrs. Pirkheim commenced this civil action against First UNUM in District Court for the City and County of Denver, Colorado, alleging two claims: breach of contract and bad faith breach of insurance contract. First UNUM removed the action to this court on December 2, 1997, averring subject-matter jurisdiction exists under 28 U.S.C. § 1331 because, as a matter of law, Mr. and Mrs. Pirkheim's claims are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001–1461 (1994 & Supp. 1997). Contemporaneously with the filing of its notice of removal, First UNUM moved to dismiss Mr. and Mrs. Pirkheim's complaint pursuant to Rule 12(b)(6), again arguing that Mr. and Mrs. Pirkheim's claims are preempted by ERISA. By written order entered February 19, 1998, I denied First UNUM's motion to dismiss. First UNUM filed its answer on March 2, 1998. Mr. and Mrs. Pirkheim did not

move to remand the action to state court. A pretrial order entered December 7, 1998.

### III. SUMMARY JUDGMENT STANDARDS

Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The non-moving party has the burden of showing that issues of undetermined material fact exist. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that it believes demonstrate the absence of genuine issues for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. United States,* 622 F.2d 516, 519 (10th Cir. 1980); Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Where, as here, the parties file cross-motions for summary judgment, I assume that no evidence need be considered other than that filed by the parties. Nevertheless, summary judgment is inappropriate if genuine issues of material fact exist. *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.,* 124 F.3d 1321, 1323 (10th Cir.1997).

Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence present in the motion and response. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505; *Mares,* 971 F.2d at 494.

### IV. ANALYSIS OF CROSS–MOTIONS FOR SUMMARY JUDGMENT

#### a. Nature of the Policy

 As a threshold matter, First UNUM argues that the policy is an accidental death policy and not a life insurance policy. Mr. and Mrs. Pirkheim concede this fact. I too recognize the distinction between accidental death and life insurance policies. *See Winchester v. Prudential Life Ins. Co. of America,* 975 F.2d 1479, 1486 (10th Cir.1992) (noting differences). Nonetheless, I must interpret the terms of the policy by giving words their common and ordinary meaning as a reasonable person would understand them. *Chiles v. Ceridian Corp.,* 95 F.3d 1505, 1515 (10th Cir.1996); *Blair v. Metropolitan Life Ins. Co.,* 974 F.2d 1219, 1221 (10th Cir.1992). I must also interpret the terms of the policy as a whole and, if unambiguous, construe them as a matter of law. *Chiles,* 95 F.3d at 1511. Thus, generic industry labels are not controlling.

#### b. Legal Standards of Review Under ERISA

As noted above, I denied First UNUM's motion to dismiss regarding ERISA preemption. I concluded that the complaint

alleged facts sufficient to support the application of the "safe harbor" provisions of 29 C.F.R. § 2510.3–1(j). Despite their opposition to First UNUM's motion to dismiss, Mr. and Mrs. Pirkheim now concede that the policy constitutes an ERISA-governed plan. (Plfs.' Brf. at 5.)

The parties disagree, however, regarding the proper standard of review to be applied in this case. First UNUM argues that the proper standard of review is "arbitrary and capricious," (Def.'s Brf. at 7–8), while Mr. and Mrs. Pirkheim contend that the proper standard of review is "*de novo*." (Plfs.' Brf. at 5–6.) Mr. and Mrs. Pirkheim are correct.

■ A court must review the decision denying benefits under an ERISA plan *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115, 109 S.Ct. 948; *accord McGraw v. The Prudential Ins. Co. of America*, 137 F.3d 1253, 1258 (10th Cir. 1998). As noted by the Tenth Circuit Court of Appeals:

> In *Firestone*, the Supreme Court held that if a benefit plan does not expressly grant the plan administrator discretion to interpret the terms of the plan or eligibility under the plan, courts must apply a *de novo* rather than an arbitrary and capricious standard when reviewing the administrator's decision. 489 U.S. at 112–113, 109 S.Ct. 948. In reaching that conclusion, the Court reasoned that where a plan does not give the administrator exclusive discretion to interpret the plan, it would make little sense to impose a standard of review that would afford employees less protection than they enjoyed prior to ERISA, when actions challenging an employer's denial of benefits were governed by state contract law. *Id.* at 112–114, 109 S.Ct. 948.

*Adams v. Cyprus Amax Minerals Co.*, 149 F.3d 1156, 1159–1160 (10th Cir.1998).

After closely reviewing the text of the First UNUM policy, I find no language conferring discretionary authority on the administrator to determine entitlement to benefits. Nor does First UNUM point to any language conferring such authority. Accordingly, *de novo* review is proper. *See Firestone*, 489 U.S. at 115, 109 S.Ct. 948; *McGraw v. Prudential Ins. Co. of America*, 137 F.3d 1253, 1258 (10th Cir. 1998). *Cf. Winchester*, 975 F.2d at 1483 (applying arbitrary and capricious standard of review when plan summary stated that "Prudential, as Claim Administrator, determines the benefits for which an individual qualifies under the Benefit Plan" and that "the insurance company has the exclusive right to interpret the provisions of the Plan, [and] its decision is conclusive and binding."); *Jones v. Kodak Medical Assistance Plan*, 169 F.3d 1287, 1290–1291 (10th Cir.1999) (arbitrary and capricious standard was appropriate standard of review of an ERISA plan administrator's denial of benefits when the plan gave the administrator "full discretionary authority in all matters related to the discharge of his responsibilities including, without limitation, his construction of the terms of the Plan and his determination of eligibility for Coverage and Benefits").

#### c. Analysis of the Policy Terms

The First UNUM policy states, in pertinent part: "The loss must result directly and independently of all other causes from accidental bodily injury which occurs while this policy is in force as to the Insured, herein called 'injury.'" The policy's definition section does not define the terms "accidental," "bodily injury," or "directly and independently of all other causes." Thus, as noted above, I must interpret the terms of the policy by giving them their common and ordinary meaning as understood by a reasonable person. *Chiles*, 95 F.3d at 1515. I must also interpret the terms of the policy as a whole and, if unambiguous, construe them as a matter of law. *Id.* at 1511. I interpret each category of terms separately. *See Winchester*, 975 F.2d at 1485 (conducting a three-part analysis of the same terms).

### 1. *"Accidental"*

■ Mr. and Mrs. Pirkheim, as well as First UNUM, urge that I adopt the following definition of "accident" as found within Black's Law Dictionary:

An accident within accident insurance policies is an event happening without any human agency, or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens. A more comprehensive term than "negligence," and in its common signification the word means an unexpected happening without intention or design.

BLACK'S LAW DICTIONARY 15 (6th ed.1990). Applying that definition, I conclude that an "accident" occurred under the policy. Here, the event or occurrence was the malfunction of the pacemaker. That malfunction was clearly "unusual and not expected" and, based on the record before me, that malfunction occurred "without intention or design."

Though First UNUM urges application of the Black's Law Dictionary definition cited above, it argues that I should engraft onto that definition a requirement that the event be "external" to the body. (Def.'s Brf. at 11) (citing *Equitable Life Assurance Soc'y of United States v. Hemenover*, 100 Colo. 231, 67 P.2d 80 (1937).) In *Hemenover*, however, the insurance policy at issue stated: " 'Death from accident means death resulting solely from bodily injuries caused directly, exclusively and independently of all other causes by *external*, violent and purely accidental means....' " *Hemenover*, 100 Colo. at 234, 67 P.2d at 81 (emphasis added). The policy at issue here contains no such qualifying word and, therefore, I decline to adopt First UNUM's suggested definition.

■ First UNUM also argues that the Amended Certificate of Death lists the manner of death as "natural" instead of "accidental." I agree with Mr. and Mrs. Pirkheim, however, that the Amended Certificate of Death is not controlling. Foremost, it was prepared by Dr. Schaffer who had a conflict of interest. Although the exact resolution of Mr. and Mrs. Pirkheim's malpractice action against Dr. Schaffer is not disclosed by the record, the existence of that lawsuit and the settlement impugns the credibility of his assertion. Further, I must interpret the terms of the policy by giving words their common and ordinary meaning as understood by a reasonable person, not Dr. Schaffer. *Chiles*, 95 F.3d at 1515. To the extent the plan administrator relied on Dr. Schaffer's statement that the malfunction of the pacemaker was "natural" as opposed to "accidental," that reliance was not reasonable. Specifically, Intermedics Inc.'s Reliability Analysis Laboratory concluded that the pacemaker malfunctioned because of "battery depletion," (Ltr. from Devine to Mr. and Mrs. Pirkheim of 11/9/95, Ex. A of Def.'s Brf. at 62), which was "unusual," "not expected," and "without intention or design." BLACK'S LAW DICTIONARY, *supra*, at 15. Thus, I conclude that the injury was "accidental" under the First UNUM policy.

My conclusion is in accordance with *Carroll v. CUNA Mutual Ins. Soc'y*, 894 P.2d 746 (Colo.1995). In *Carroll*, a beneficiary sought a determination that his wife's death during sexual intercourse was a covered event under a policy that provided benefits for "bodily injury caused by an accident ... resulting directly and independently of all other causes...." *Id.* at 748. Expert testimony revealed that the wife died as a result of a massive hemorrhage due to the rupture of a preexisting aneurysm. *Id.* The Colorado Supreme Court concluded that, because death was not an anticipated, intended, or foreseeable result of sexual intercourse, it was an accident under the policy. *Id.* at 753. *See also Reed v. United States Fidelity and Guaranty Co.*, 176 Colo. 568, 573, 491 P.2d 1377, 1380 (1971) (unforeseen exacerbation of heart condition could have been an accidental injury). Here, Logan Pirkheim's death was not an anticipated, intended, or foreseeable result of implantation of a pacemaker and, therefore, it was an accident under the First UNUM policy.

### 2. *"Bodily Injury"*

"Bodily injury" is defined as "[p]hysical pain, illness or any impairment of physical condition." BLACK'S LAW DICTIONARY 786 (6th ed.1990). It is also defined as "hurt, damage, or loss sustained" "concerning the body." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1164 (defining "injury"), 245 (defining "bodily") (1986). *See also National Casualty Co. v. Great Southwest Fire Ins. Co.,* 833 P.2d 741 (Colo.1992) (comprehensive business policy insuring against "bodily injury" did not cover a claim for purely emotional harm).

 First UNUM suggests that "bodily injury" must be caused by "external, violent forces of such things as falls ... and shootings." (Def.'s Brf. at 9 (collecting cases).) I disagree. The common and ordinary meaning of "bodily injury" is simply injury to any part of the body, regardless whether that injury is internal or external. Causation of the "bodily injury" is a separate issue which is dealt with below. Here, it is undisputed that Logan Pirkheim suffered "cerebral congestion and edema, pulmonary congestion and edema, and a peritoneal effusion" incident to cardiac arrhythmia. (Comment of Dr. Caldwell, Ex. A of Def.'s Brf. at 42.) I conclude, therefore, that "bodily injury" occurred under the First UNUM policy.

### 3. *"Directly and Independently of All Other Causes"*

Many courts have interpreted the phrase "directly and independently of all other causes" in accidental injury insurance policies to mean that the accident must be the predominant or proximate cause of the injury. *See, e.g., Murray v. United of Omaha Life Ins. Co.,* 145 F.3d 143, 156 (3d Cir.1998) (same) (applying New Jersey law); *Henry v. Home Ins. Co.,* 907 F.Supp. 1392, 1398 (C.D.Cal.1995) ("the predominant cause test better comports with the reasonable expectations of insureds"); *Carroll,* 894 P.2d at 755 ("the accident must be the predominant cause of injury") (construing common meaning of words to fulfill reasonable expectations of

ordinary person purchasing policy); *Life Ins. Co. of North America v. Evans,* 195 Mont. 242,, 637 P.2d 806, 808–809 (1981) ("The mere presence of a preexisting disease or infirmity will no longer relieve the insurer from liability in this state. Recovery may be had even though the disease appears to have actually contributed to the cause of death as long as the accident sets in motion the chain of events leading to death, or if it is the prime or moving cause."); *Burgett v. Stuyvesant Life Ins. Co.,* 236 So.2d 306, 308 (La.App.1970) (interpreting the phrase "resulting directly and independently of all other causes, from an accident" to require plaintiff to prove by a preponderance of the evidence that the accident was the predominant cause of the injury). *But see Quesinberry v. Life Ins. Co. of North America,* 987 F.2d 1017, 1028 (4th Cir.1993) (interpreting the phrase "loss resulting directly and independently of all other causes from bodily injury caused by accident" to preclude recovery only when the preexisting condition, pre-disposition, or susceptibility to injury substantially contributed to the disability or loss).

 First UNUM argues, however, that the predominant cause test is applicable here only if the written documents constituting the policy are ambiguous. In support of its argument, First UNUM cites *Lott v. Hertz Custom Benefit Program,* 961 F.2d 220, 1992 WL 73061 (10th Cir. Apr.9, 1992) (unpublished op.), which states:

> [The appellant] also argues that under the common-law doctrine of "reasonable expectations" he should be covered under the [ERISA plan]. Under [the doctrine of reasonable expectations], an insurer that wishes to avoid liability under an insurance contract "must not only use clear and unequivocal language evidencing its intent to do so, but it must also call such limiting conditions to the attention of the insured. Absent proof of such disclosure, coverage will be deemed to be that which would be expected by

the ordinary lay person." *Leland v. Travelers Indemnity Company,* 712 P.2d 1060, 1064 (Colo.App.1985). This argument must fail for the same reasons that [the appellant's] estoppel arguments fail. State common law notions are preempted by ERISA when the written documents of employee benefit plans are unambiguous.

*Lott, supra,* at *2. Although *Lott* does not constitute binding precedent, 10th Cir.R. 36.3, its holding concurs with developing federal common law regarding ERISA-governed insurance plans. *See, e.g., Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382, 386 (9th Cir.1994) (finding that the reasonable expectations doctrine applied to ambiguous ERISA-governed insurance plans, but not ERISA-governed pension plans) (cited with approval in *Biava v. Insurers Administrative Corp.,* 48 F.3d 1231, 1995 WL 94461, at *7 n. 3 (10th Cir.1995) (unpublished op.) (mistakenly identifying *Saltarelli* as a Tenth Circuit Court of Appeals opinion)); *Meester v. IASD Health Services Corp.,* 963 F.2d 194, 197 (8th Cir.1992) (when an ERISA plan summary is not ambiguous, there is no occasion to apply the reasonable expectation doctrine); *Rolf v. Health and Welfare Plan for Employees of Cracker Barrell Old Country Store, Inc.,* 25 F.Supp.2d 1200, 1205 (D.Kan.1998) (same) (citing *Lott, supra* ). Thus, as a matter of federal common law regarding ERISA-governed insurance plans, application of the state common law doctrine of reasonable expectations is improper unless the plan is ambiguous or contains an insufficiently conspicuous exclusionary provision. To prevail in this case, Mr. and Mrs. Logan must therefore establish that the First UNUM policy is ambiguous before the reasonable expectations doctrine becomes applicable.

■ I must give the language its " 'common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.' " *Chiles,* 95 F.3d at 1511 (quoting *Blair v. Metropolitan Life Ins. Co.,* 974 F.2d 1219,

1221 (10th Cir.1992)); *accord Capital Cities/ABC, Inc. v. Ratcliff,* 141 F.3d 1405, 1411 (10th Cir.1998). Ambiguity exists when "a contract provision is reasonably and fairly susceptible of more than one meaning." *Geralnes B.V. v. City of Greenwood Village, Colorado,* 583 F.Supp. 830, 838 (D.Colo.1984) (citation omitted).

■ I conclude that the phrase "directly and independently of all other causes," when read in the context of the "Insuring Clause," is not ambiguous. The "Insuring Clause" states, in relevant part: "The loss must result directly and independently of all other causes from accidental bodily injury . . . ." (First UNUM Life Insurance Company Accident Insurance Policy ("the First UNUM policy"), Ex. B of Def.'s Brf. at 1.)

In *Hightshue v. AIG Life Ins. Co.,* 939 F.Supp. 1350 (S.D.Ind.1996), the District Court analyzed the meaning of the phrase "directly and independently of all other causes" and concluded as follows:

As a fifth argument in support of her claim that [the defendant] acted arbitrarily and capriciously, [the plaintiff] asserts that the policy language upon which [the defendant] relied is "vague, ambiguous, [and] internally repugnant." Specifically, she points to the section of the Plan which defines injury as "bodily injury caused by an accident occurring while this policy is in force as to the Injured Person and resulting directly and independently of all other causes in loss covered by this policy." In essence, [the plaintiff] contends this language is ambiguous because an injury cannot result "directly . . . of all other causes" and "independently of all other causes." This Court agrees that such conditions, if actually imposed by the policy, might show ambiguity or even internal inconsistency.

However, this Court need not impose such a strained reading upon the text of the Plan. Clearly, this sentence merely requires that an injury must result "directly" and "independently of all other

causes" to be covered by the Plan. In other words, this definition simply limits coverage to bodily injuries resulting directly from an accident and independently of any other cause. According to the Seventh Circuit, a court must interpret the language of an ERISA plan " 'in an ordinary and popular sense as would a person of average intelligence and experience ....' " *Wahlin[v. Sears, Roebuck & Co.]*, 78 F.3d at 1235[, (7th Cir.1996) ] (quoting *Brewer v. Protexall, Inc.*, 50 F.3d 453, 457 (7th Cir.1995)). " 'A term is [only] ambiguous if it is subject to reasonable alternative interpretations.' " *Wahlin*, 78 F.3d at 1235 (quoting *Bechtold v. Physicians Health Plan*, 19 F.3d 322, 325 (7th Cir. 1994)). While [the plaintiffs] counsel has advanced an alternative interpretation, that interpretation cannot be described as reasonable. A person of average intelligence and experience would understand this definition to have the meaning stated previously by this Court. As such, the definition of "injury" is not ambiguous, and a court should " 'not artificially create ambiguity where none exists.' " *Hammond v. Fidelity and Guaranty Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir.1992) (quoting *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir.1990)).

*Hightshue*, 939 F.Supp. at 1360–1361. Like the District Court in *Hightshue*, I conclude that the word "directly" cannot reasonably be understood as modifying the words "of all other causes." Rather, the word "directly" obviously modifies the words "from accidental bodily injury." The phrase "directly and independently of all other causes from accidental bodily injury," while unartfully drafted, is not ambiguous. That phrase unambiguously requires that: (1) the loss result directly from accidental bodily injury; and (2) the loss result independently of all other causes. Because that phrase is not ambiguous, I may not apply the Colorado common law doctrine of reasonable expectations to the First UNUM policy, an ERISA-governed insurance plan.

At this juncture, it is important to note that this holding is limited to the subset of accidental insurance policies that are governed by ERISA. As noted by Mr. and Mrs. Pirkheim, if the First UNUM accidental insurance policy were not governed by ERISA, the predominant cause test enunciated in *Carroll, supra,* would apply and they would likely prevail because the pacemaker malfunction was the predominant cause of Logan Pirkheim's death. Yet because the First UNUM accidental insurance policy is governed by ERISA, the predominant cause test enunciated in *Carroll* is inapplicable. *Lott, supra; Saltarelli,* 35 F.3d at 386; *Biava, supra; Meester,* 963 F.2d at 197; *Rolf,* 25 F.Supp.2d at 1205. Consequently, even when ERISA-governed and non-ERISA-governed accidental insurance policies have identical language, the extent of coverage may differ substantially. Although such disparity may be explained by analyzing the difference between federal law and state law, such disparity nonetheless exemplifies yet another "Serbonian Bog" of insurance law for the unwary. *See Landress v. Phoenix Mutual Life Ins. Co.,* 291 U.S. 491, 499, 54 S.Ct. 461, 78 L.Ed. 934 (1934) (Cardozo, J., dissenting) (calling the attempted distinction between accidental results and accidental means a "Serbonian Bog") (referring to John Milton, Paradise Lost, bk. 2,1. 592 (1667)) ("A gulf profound, as that Serbonian Bog [Lake Serbonis, in lower Egypt] Betwixt Damiata and Mount Casius old, Where armies whole have sunk....").

Nonetheless, applying the unambiguous terms of the First UNUM policy to the facts of this case, I am compelled on *de novo* review to conclude that the plan administrator did not err in denying accidental death benefits to Mr. and Mrs. Pirkheim. As stated above, the First UNUM policy unambiguously requires that the loss result "independently of all other causes." Here, Logan Pirkheim's death did not result independently of all other causes. Although pacemaker mal-

function may have been the predominant cause of his death, his death did not occur independent of his arrhythmia, which was certainly another cause of his death. Alternatively, I note that, although Logan Pirkheim's "previous cardiac repair was found to be intact" during autopsy, (Comment of Dr. Caldwell, Ex. A of. Def.'s Brf. at 42), his arrhythmia constitutes a "bodily infirmity" excluded from coverage. (First UNUM Life Insurance Company Accident Insurance Policy, Ex. B of Def.'s Brf. at 4.)

Accordingly, I ORDER that:

(1) defendant's motion for summary judgment is GRANTED;

(2) plaintiffs' motion for summary judgment is DENIED;

(3) plaintiffs' complaint is DISMISSED;

(4) defendant is AWARDED its costs; and

(5) the final trial preparation conference scheduled to commence Wednesday, June 9, 1999 at 9:30 a.m., and the trial scheduled to commence June 28, 1999, are VACATED.